JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
William Bailey, Jr.

**DEFENDANTS**
City of Philadelphia, Leon Lubiejewski (Badge No. 743), James Dougherty (Badge No. 842) and John Does 1-30

**(b)** County of Residence of First Listed Plaintiff _Philadelphia_
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _Philadelphia_
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
KLINE & SPECTER, PC
1525 Locust Street, Philadelphia, PA 19102
Phone: (215) 772-1000

Attorneys *(If Known)*
TBD

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [X] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |

(Full listing below, merged for clarity)

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [X] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
1988 Wrongful conviction

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE
April 1, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Thomas R. KLine

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:___Philadelphia, PA_____

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit? **Yes** ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? **Yes** ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? **Yes** ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? **Yes** ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. **Yes** ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A. *Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B. *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____
  _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**William Bailey, Jr.**
6000 Baltimore Avenue, Apartment 204
Philadelphia, PA 19143

     *Plaintiff,*

    v.

**City of Philadelphia**
c/o Philadelphia Police Department
400 N. Broad Street
Philadelphia, PA 19130

**Detective Leon Lubiejewski and**
**Detective James Dougherty**
c/o Philadelphia Police Department
400 N. Broad Street
Philadelphia, PA 19130

**Philadelphia Police Officers & Employees and/or**
**Philadelphia District Attorney's Office Prosecutors**
**John Doe Nos. 1 Through 30**

     *Defendants.*

**FILED PURSUANT TO**
**28 U.S.C. §§ 1367, 1391**

CIVIL ACTION NO.

COMPLAINT

JURY TRIAL DEMANDED

## CIVIL ACTION – COMPLAINT

Plaintiff William Bailey, Jr., by and through his attorneys, Kline & Specter PC, alleges as follows:

## PRELIMINARY STATEMENT

1. For 36 years, from his conviction in 1988 until his exoneration and release in 2024, William Bailey, Jr. was incarcerated for a murder he did not commit.

2. At the time of his arrest, Mr. Bailey was a 30-year-old father of three young children. He had been honorably discharged from the United States Army after six and a half years of service and worked at the Federal Reserve Bank of Philadelphia. He had never been arrested

prior to his wrongful arrest on February 14, 1987.



Mr. Bailey on the day of his release, April 4, 2024.

3.      Mr. Bailey's ordeal was the direct result of the unconstitutional acts of the Defendants, who unreasonably pursued Mr. Bailey as the sole suspect and framed him for the murder of Derek "Ditto" Walker, despite the lack of reliable evidence against Mr. Bailey and evidence pointing to other suspects. As a result, Mr. Walker's true killer has never been brought to justice.

4.      On 1987, Mr. Bailey was wrongfully arrested for the murder of Mr. Walker, based on the mistaken, uncertain identification of a single eyewitness, Victor Pelzer, who later recanted his testimony.

5.      This arrest was unlawful and made without probable cause, as Pelzer's mistaken identification was contradicted by multiple eyewitnesses who told police Mr. Bailey was not at the scene at the time of the murder and who identified other suspects, as well as by three separate alibi witnesses Police did not attempt to speak with before arresting Mr. Bailey. Only by omitting material exculpatory facts and misrepresenting the few inculpatory facts was Defendant Detective Lubiejewski able to obtain a warrant for Mr. Bailey's arrest.

6. After he was arrested, February 14, 1987, Mr. Bailey was interrogated by Defendant Detectives Lubiejewski and Dougherty. Mr. Bailey maintained his innocence throughout the interrogation. The Defendants documented this fact in two separate reports, which they then suppressed for over 30 years. Despite this documented fact, Defendant Detective Lubiejewski, in concert with Detective Dougherty, fabricated a confession and falsely testified that Mr. Bailey confessed to the murder.

7. In 1988, Mr. Bailey was wrongfully convicted of Mr. Walker's murder, in a trial that focused on Pelzer's mistaken identification and the fabricated confession. Mr. Bailey was sentenced to life in prison.

8. For the 36 years that followed, Mr. Bailey maintained his innocence.

9. In the years leading up to Mr. Bailey's 1997 Post-Conviction Relief Act ("PCRA") hearing, two critical witnesses—including Victor Pelzer—recanted their testimony, and several others stepped forward with new exculpatory evidence.

10. In 2021, the Philadelphia District Attorney's Office ("DAO") Conviction Integrity Unit ("CIU") disclosed significant exculpatory evidence from both the Philadelphia Police Department's homicide file ("H-File") and the DAO's file ("DAO File"), which had been withheld for over three decades.

11. On April 4, 2024, the Court of Common Pleas of Philadelphia County granted Mr. Bailey's Post-Conviction Relief Act petition and vacated his conviction and entered a negotiated *Alford* plea to lesser included offenses, with a sentence of time served.

12. On April 4, 2024, Mr. Bailey was freed after 36 years in confinement for a crime he did not commit.

13. Mr. Bailey's wrongful conviction was caused by numerous violations of his

constitutional rights.

14. Mr. Bailey's unlawful arrest and conviction were the product of unconstitutional policies, customs, and practices that existed within the Philadelphia Police Department. These unconstitutional policies, customs and practices resulted in Mr. Bailey's arrest without probable cause, the fabrication of evidence, and the suppression of crucial exculpatory evidence. This resulted in an unfair trial and unlawful conviction.

15. Plaintiff now brings this action pursuant to 42 U.S.C. § 1983 against the officers and municipalities responsible for the violation of his constitutional rights.

**PARTIES**

16. Plaintiff, William Bailey was born in 1956 and was at all relevant times an adult citizen of the Commonwealth of Pennsylvania. He resides in Philadelphia, Pennsylvania.

17. At all relevant times, Defendants Detective Lubiejewski and Detective Dougherty were adult citizens of the Commonwealth of Pennsylvania and employees of the Philadelphia Police Department, who acted under color of state law and within the course and scope of their employment. At all relevant times, these individual Defendants were responsible for investigating suspected homicides in Philadelphia and were familiar with the laws, regulations, and policies applicable to police officers in the City of Philadelphia and the United States.

18. At all relevant times, the John Doe Defendants, whose identities are currently unknown and may be determined during discovery, were adult citizens of the Commonwealth of Pennsylvania and employees of either the Philadelphia Police Department or Philadelphia District Attorney's Office who acted under color of state law and within the course and scope of their employment. At all relevant times, the John Doe Defendants were responsible for investigating and/or prosecuting the murder of Derek Walker and were familiar with the laws, regulations, and

4

policies applicable to their office in the City of Philadelphia and the United States.

19.     The identities of the John Doe Defendants, which are currently unknown to Plaintiffs and will be determined through discovery, may include Lt. Joe Henwood, Sgt. Frank Westerman, deceased, Det. Hugh Lynch, Ofc. William McDowell (Badge #6940), Ofc. Gerald McLaughlin (Badge #4433), Ofc. Pamela Lovell (Badge #5829) Ofc. William Withers (Badge #9576), Det. Frank Edwards, Ofc. Theresa Jesberger, Ofc. Frank Oliverio, Detective John Rechner, Det. John Peterson, Ofc. Joseph Fleming, Det. Daniel J. McCormick, deceased, Sgt. Paul Musi, Det. Franklin L. McGuoirk III, deceased, Assistant District Attorney ("ADA") Barbara "Bashi" Buba, ADA Donna Gene Zucker, ADA Catherine Lynn Marshall, ADA Carol Sweeney, ADA Robin Godfrey and all other Philadelphia Police and Philadelphia DAO personnel who participated in the investigation of Derek Walker's murder and/or Leonard Braxton's Murder, and/or the prosecution of Mr. Bailey.

20.     All individual defendants known and unknown are named in their individual capacities.

21.     Defendant City of Philadelphia is a Pennsylvania municipal corporation and is or was the employer of each of the individual Defendants through the Philadelphia Police Department. The City of Philadelphia is a person within the meaning of 42 U.S.C. § 1983. At all relevant times, the City of Philadelphia was responsible for the policies, procedures, and practices of the Philadelphia Police Department and the District Attorney's Office.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a), as Plaintiffs' claims arise 42 U.S.C. § 1983 and the Constitution of the United States, and, thus, this matter falls under the Court's original jurisdiction.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants can be found in, reside, or transact business in this District.

24.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

**FACTS**

**<u>The Murder of Derek "Ditto" Walker</u>**

25.     On February 7, 1987, Derek "Ditto" Walker was tragically shot and killed outside Will's Bar & Lounge on the corner of 55th & Spruce Streets in West Philadelphia at or around 10:18 PM.

26.     Immediately before the fatal shooting, Mr. Walker was engaged in a fight with Gerald "Earth" Brown.

27.     The altercation originated inside the bar. Various employees of the bar, including the DJ and the bartender Albert Bailey, who is Plaintiff's brother, instructed the group to take their dispute outside.

28.     The fight proceeded outside the bar and attracted a large crowd. Spectators watched as Mr. Brown punched Mr. Walker, slashed his face with a broken bottle, and then proceeded to repeatedly pistol whip him.

29.     The fight ended when an unknown shooter fired a single shot that grazed Mr. Brown's head, and the large crowd dispersed.

30.     Shortly after the fight and the initial shooting, another unknown shooter approached Mr. Walker and fired a single .25 caliber round at close range into Mr. Walker's head, killing him.

31.     Police arrived within minutes. Defendant Detective Lubiejewski was assigned as lead detective.

## The Philadelphia Police Department's Initial Investigation

32.  In the hours following the shooting, Detectives interviewed nearly 40 witnesses, most of whom were patrons at the bar during the incident.

33.  Several witnesses who spoke with police indicated they would be able to identify the shooter if they saw him, including Gary Evans, Jacqueline Ross, Sheila Brown, James Drewery, and Victor Pelzer.

34.  These witnesses' descriptions of the shooter varied in age, height, weight, skin tone, dress, and facial hair:

a.  **Drewery**: Either 36 or 37 years old, black male, 6'1" 175lbs with a goatee;

b.  **Pelzer**: "Between 25-30 yrs. old 5'8" to maybe 6'0" tall, thin build, light brown complexion."

c.  **Ross**: About 6'2", brown skin, slight mustache, dark color Jeff cap, long beige wool coat with a split in the back;

d.  **Evans**: 5'11"-6'0", dark complexion, husky build, clean shaven, wearing a black dress hat;

35.  One witness, Jacqueline Ross, told detectives that the argument that led to the shooting was related to a gang dispute involving a local mosque and who "ran it." The witness told police that the people who started the argument were "Cedar Avenue guys," referring to a West Philadelphia street gang.

36.  Mr. Bailey was neither Muslim nor affiliated with any gangs.

37.  One witness told detectives that she was told about a recent altercation between Albert Bailey and Mr. Walker.

38.  At least one witness identified the shooter as "Fred."

39.     In a statement to detectives on the night of the murder, Victor Pelzer told detectives, "I think it was Al the bartender's brother," who was the shooter. Pelzer told detectives Al the bartender's brother was someone who he had "met a few times over the years" but didn't know his name.



See Pelzer Interview Record, **Exhibit 1** (annotations added).

40.     Pelzer also told detectives that the fight between Walker and Brown stemmed from an altercation at Will's Bar the previous evening between Walker and a group of girls.

41.     Pelzer also told detectives that he saw "Michelle, Al the bartender's girlfriend" in the area where the shooter went to get the gun, and that Michelle and several other people tried to stop the shooter and convince him not to go back outside. Pelzer also stated that "AL might have been there too."

42.     "Al the bartender" refers to plaintiff's brother, Albert Bailey, who was a bartender at Will's Bar. Upon information and belief, "Michelle" refers to Michelle Ford, who also worked at Will's Bar.

43.     After Pelzer gave his statement on the night of the murder, the police began asking

witnesses about Mr. Bailey.

44. At least six other witnesses interviewed on the night of the murder indicated they knew Mr. Bailey, including Rose Thomas, Angela Bosely, Karen Sharpe, Jordan Boyce, Gail Parker, and Renee Bingham. None recalled seeing Mr. Bailey at Will's Bar at the time of the shooting.

45. When police interviewed Albert Bailey, he initially told police his brother was "nowhere around" the bar that night and later told police that his brother had been there earlier in the evening but left by 8:30-9:00 PM, before the fight and shooting.

46. On February 9, 1987, Mr. Bailey voluntarily agreed to speak with Detective Lubiejewski. The interview lasted for approximately 4 hours.

47. Mr. Bailey denied any involvement in the murder of Mr. Walker and provided an alibi for his whereabouts that could be verified with three separate individuals who he was with at the time.

48. Mr. Bailey informed Detective Lubiejewski that he knew Mr. Walker because they grew up together.

49. Mr. Bailey also indicated that the night before the murder, he encountered Mr. Walker at Will's Bar. During the encounter, Mr. Walker was intoxicated and was thrown out of the bar. While Mr. Walker was being removed from the bar, he attempted to punch Mr. Bailey but missed.

50. Mr. Bailey also informed Detective Lubiejewski that he was present at Will's Bar the night of the murder, and briefly spoke with Mr. Walker, who apologized for the events that occurred the previous day. Mr. Bailey accepted his apology.

51. Mr. Bailey stated that he then left the bar with two women, Beverly Harris and Eva

"Cookie" Mason, before the fight between Mr. Walker and Mr. Brown and the subsequent shootings occurred. Mr. Bailey, Ms. Harris, and Ms. Mason went to Theresa Cotton's apartment on 52nd street between Hazel and Larchwood Avenue, Philadelphia. When they returned to Will's Bar, the shooting had already occurred and police were present.

52. Upon information and belief, police never interviewed Mr. Bailey's alibi witnesses, Beverly Harris and Eva "Cookie" Mason, nor ever attempted to.

53. Upon information and belief, police did not interview alibi witness Theresa Cotton until on or about July 22, 1988, just weeks before Mr. Bailey's trial. Ms. Cotton gave an exculpatory statement that placed Mr. Bailey at her home until after 11:00 PM.

54. Detective Lubiejewski took a lengthy statement (75-483) from Bailey, which Bailey signed, and documented the contents of Bailey's interview in the daily activity sheet.

55. Mr. Bailey also agreed to be photographed for a photo array that would be shown to witnesses.

56. On or about February 13, 1987, Detective Lubiejewski showed Mr. Pelzer a "stack" photo array containing Mr. Bailey's recent photo, and Mr. Pelzer identified him as the shooter.

57. Upon information and belief, Detectives did not show the photo array to any of the other multiple witnesses to the shooting, including the four additional witnesses who police were told would be able to identify the shooter.

58. On or about the morning of February 14, 1987, Detective Lubiejewski prepared an affidavit of probable cause for Mr. Bailey's arrest.

59. On February 14, 1987, at or about 1:55 PM, Mr. Bailey was arrested and charged with the murder of Mr. Walker.

10

60.	On the night of the murder, Detectives interviewed an eyewitness who identified the shooter as "Fred." Upon information and belief, "Fred" refers to Fred Ransom, a/k/a Fred Ramsey, a/k/a John Ramsey, who has subsequently been identified as the probable shooter through investigations and proceedings related to Mr. Bailey's PCRA petitions.

61.	Documents within the H-File contain police investigation notes that identified the shooter as "Fred," and that he was part of the "argument in the bar," which "was over old gang ties."

62.	The note even provided a detailed description of Fred describing him as "6'2, tall, thin, 30years, beige coat, jeff cap, slight mustache."

63.	Despite being armed with this crucial information, the Defendants did not investigate Fred Ransom as an alternative suspect to Mr. Walker's homicide.

64.	Fred Ransom and Mr. Bailey shared a resemblance at the time of the murder.

 

*Left: Fred Ransom, circa 1996; Right: William Bailey's headshot from photo array circa 1987.*

65.	Upon information and belief, the Defendants never showed Fred Ransom's photo to Mr. Pelzer or any other eyewitnesses.

66.     Upon information and belief, the Defendants never interviewed Michelle Ford, whom Victor Pelzer had identified as one of the bar employees who tried to stop the shooter from going back outside the bar prior to the murder.

67.     Upon information and belief, the Defendants never investigated the lead developed through the interview of eyewitness Jacqueline Ross that Mr. Walker's murder related to a gang dispute involving the "Cedar Avenue guys" over control of the local mosque.

68.     Upon information and belief, the Defendants did not follow up on evidence gathered after Mr. Bailey's arrest that the murder of Mr. Walker was arranged by the owner of Will's Bar, William Morrison.

**Philadelphia Police Detectives Lacked Probable Cause to Arrest William Bailey, Jr.**

69.     Upon information and belief, the affidavit of probable cause to arrest Mr. Bailey, prepared by Det. Lubiejewski, contained multiple material omissions. These include:

a.  Omitting a witness's identification of "Fred" as the shooter;

b.  Omitting the fact Mr. Bailey had provided a verifiable alibi that detectives had not checked;

c.  Omitting that all six witnesses interviewed on the night of the murder who knew Mr. Bailey, besides Mr. Pelzer, were unable to place Mr. Bailey at the scene at the time of the murder;

d.  Omitting that other eyewitnesses to the shooting who professed to be able to identify the shooter had given descriptions of the shooter that conflicted with Pelzer's description;

e.  Omitting that police had not shown a photo identification lineup to any of the witnesses who professed to be able to identify the shooter besides Pelzer.

12

f. Omitting the intoxication of witnesses relied upon in the affidavit;

g. Falsely overstating Victor Pelzer's confidence in his initial identification of Mr. Bailey.

70. Upon information and belief, these facts were not known to the ADA responsible for reviewing the affidavit of probable cause

**<u>Detective Lubiejewski Fabricates a Confession</u>**

71. At trial, Defendant Detective Lubiejewski falsely testified that Mr. Bailey confessed to murdering Mr. Walker.

72. Detectives Lubiejewski and Dougherty each interrogated Mr. Bailey on February 14, 1987, following his arrest.

73. According to a 2024 letter sent by the DAO to Philadelphia Court of Common Pleas Judge presiding over Mr. Bailey's PCRA proceedings ("2024 DAO Letter"), **Exhibit 2**, a handwritten chronology of investigation in the homicide file indicates Mr. Bailey was interviewed first by Detective Lubiejewski for two hours and then by both Detective Lubiejewski and Detective Dougherty for almost an hour and a half. However, at trial, both Detectives Lubiejewski and Dougherty testified that only Dougherty was present for the second interview. No formal statement (Form 75-483) was taken.

74. For much of that time, Mr. Bailey was left in the interrogation room alone, handcuffed to a chair. The detectives took turns entering the room briefly, telling Mr. Bailey that he had killed Mr. Walker, that he was going to jail, and other similar statements.

75. Detective Lubiejewski then asked Mr. Bailey to recount the events of the night of the shooting.

76. Consistent with what he had told Detective Lubiejewski a week earlier, Mr. Bailey

explained that he, along with two women, had left Will's Bar before the fight between Mr. Walker and Mr. Brown and walked down to an apartment on 52nd Street between Larchwood and Hazel Streets. By the time he returned to the bar, the shooting had occurred, and police had already arrived.

77. Detective Lubiejewski then asked Mr. Bailey about Derek Walker's funeral. Mr. Bailey told him that he had gone to the viewing and funeral that day but did not go to the cemetery.

78. During this time, Detective Lubiejewski did not write anything down or show any notes to Mr. Bailey.

79. Mr. Bailey did not sign any statements during his interrogation by the Defendant Detectives on February 14, 1987.

80. Less than a week after Mr. Bailey's arrest, on February 20, 1987, Detective Lubiejewski testified at the preliminary hearing. At no point during Detective Lubiejewski's testimony did he claim that Mr. Bailey had confessed to the murder.

81. On or about July 15, 1988, just weeks before the trial, the Commonwealth disclosed three pages of handwritten notes purporting to record the February 14, 1987 interrogation and the "confession."

82. In one of these notes, Detective Lubiejewski wrote the words, "yeah I did it."

83. These notes were not signed by Mr. Bailey.

84. At trial, Detective Lubiejewski testified that Mr. Bailey had confessed during the interrogation. *See* Notes of Testimony Vol. 2, **Exhibit 4**, at 52–57.

85. At trial, Detective Lubiejewski testified that when he pressed Mr. Bailey as to why he had not gone to the cemetery after Mr. Walker's funeral, "He began to sob, tears were welling up in his eyes and he kind of put his head down. And I asked him what's the matter. And with his

14

head down in a low voice he said, 'I did it, I did it.' Then he looked up at me and said, 'No, I didn't mean to say that. I wasn't there, I was at an apartment on 52nd Street when it happened. I don't know anything about it.'"

86. Detective Lubiejewski testified that the interview continued for another forty-five minutes to an hour, during which Mr. Bailey "kept insisting that [the prior statement] was a mistake, that he hadn't meant to say that, that he was on 52nd Street, that I should talk to the girls."

87. This was false and perjured testimony. Mr. Bailey never confessed to the murder of Mr. Walker.

88. At trial, Detective Lubiejewski was shown a handwritten note marked as exhibit C-27 that he claimed to be his handwritten notes of the interrogation. The note contained a *Miranda* waiver, the words "yeah I did it," and the word "emotional" in parentheses.

89. Trial Exhibit 27 was fabricated evidence, created by Detective Lubiejewski after the fact to support the false story that Mr. Bailey had confessed.

90. Neither the H-File nor the DAO file contain any documents corroborating the supposed confession.

91. Neither the H-File nor the DAO file contain any documents corroborating the contents or existence of Detective Lubiejewski's notes prior to their production on July 15, 1988.

92. The detectives did not make any audio or video recording of the interview in which Mr. Bailey supposedly confessed.

93. The detectives did not create any written statements, signed or unsigned, documenting the interview or the supposed confession.

94. The only evidence supporting Detective Lubiejewski's version of events is the single page of notes, which were produced over a year later in July 1988, and the Detective's trial

testimony.

95. This fabricated evidence is contradicted by the only contemporaneous record of the February 14, 1987 interviews—two reports prepared that day by Detective Lubiejewski, one police activity sheet and one form 75-328. Both forms state that Mr. Bailey "gave an exculpatory statement."

96. These two forms contradicting Detective Lubiejewski's story were not produced to Mr. Bailey's defense attorney before trial.

97. When Mr. Bailey was asked about the supposed confession at trial, he testified:

Q. MR. BAILEY, HOW IS IT THAT YOU BECAME EMOTIONAL IN THE PRESENCE OF YOU AND THE DETECTIVE? BY THE WAY, THERE WAS NO ONE THERE BUT YOU AND THE DETECTIVE?

A. NO.

Q. WHAT HAPPENED?

A. I CAME IN, I WAS SITTING THERE, HE KEPT SAYING YOU

WILLIAM BAILEY, JR. - DIRECT                    168

KILLED DARRYL WALKER, YOU KILLED DARRYL WALKER, I SAID NO, I DIDN'T, NO, I DIDN'T. AND THEN HE WAS WAVING A WARRANT FOR MY ARREST IN MY FACE. AND AFTER THAT I TOLD HIM, I SAID, "I JUST CAME FROM THIS MAN'S FUNERAL," SO I STARTED CRYING AND EVERYTHING. AND HE WAS TELLING ME, WELL, YOU ARE GOING TO JAIL FOR LIFE BECAUSE YOU KILLED DITTO. I SAID I DID NOT KILL DITTO.

Q. HE HAS WRITTEN ON THERE THAT YOU SAID TO HIM YEAH OR YES, I DID IT.

DID YOU MAKE THAT STATEMENT TO HIM?

A. NO, I DIDN'T. WHEN I WAS SO EMOTIONAL I WAS SITTING THERE AND HE IS WAVING THIS WARRANT TALKING ABOUT YOU'RE GOING TO JAIL FOR 20 YEARS, YOU'RE GETTING LIFE, YOU KNOW. AND I SAID WELL, WHAT IS IT THAT YOU WANT ME TO DO. YOU WANT ME TO SAY THAT I DID IT. AND THEN AFTER THAT, THAT WAS...

Q. DID YOU CONTINUE TO TELL HIM THE ACCOUNT OF THIS INCIDENT THAT YOU TOLD US HERE THAT YOU TOLD HIM ON FEBRUARY THE 7TH?

A. YES.

Q. AND HE INTERVIEWED YOU FOR TWO MORE HOURS, DIDN'T HE?

A. YES, HE DID.

Q. YOU DIDN'T MAKE ANY STATEMENTS OF GUILT TO HIM, DID YOU?

A. NO, I JUST SAT THERE.

Notes of Testimony, Volume 3, **Exhibit 5**, at 167:20–168:25.

### Philadelphia Police Suppress Exculpatory Evidence in the Homicide Unit "H-File"

98.     When the DAO turned over the Philadelphia Police Department's H-File to Mr. Bailey's post-conviction counsel in 2021, it was revealed that the Defendants had suppressed exculpatory evidence for over three decades.

99.     Upon information and belief, Defendant Detective Lubiejewski was the lead investigator of Mr. Walker's murder, responsible for maintaining the homicide file, or "H-File" for the case.

100. The H-File contained multiple documents reflecting evidence exculpatory of Mr. Bailey.

101. Upon information and belief, these documents were known to Detectives Lubiejewski and Dougherty but were not transmitted to prosecutors.

102. Pursuant to a longstanding and widespread custom of the Philadelphia Police Department and its Homicide Unit, this suppression of exculpatory evidence was carried out through a practice of transmitting a curated subset of the H-File provided to prosecutors, known as an "H-Binder," after an arrest was made. Pursuant to this custom, Philadelphia homicide detectives including the Defendants would omit exculpatory evidence in the H-File from the H-Binder as a matter of practice.

103. The H-File contained two contemporaneous police records from the day of Mr. Bailey's arrest. Neither record mentions the alleged confession made by Mr. Bailey.

104. Instead, the records specifically state the opposite—that Mr. Bailey only provided "an exculpatory statement" during his interviews with Detectives Dougherty and Lubiejewski.

105. Specifically, the H-File contained two suppressed police documents about the February 14, 1987 post-arrest interview.

    i. a February 14, 1987 activity sheet stating: "Defendant was interviewed by Dets. Dougherty and Lubiejewski **and gave an exculpatory statement**" (emphasis added);

Defendant was interviewed by Dets. Dougherty and Lubiejewski and gave an exculpatory statement. Arraigned within six hours in front of ADA Freeman, PD: Lieberson and B/C REBSTOCK and held WOB for a further hearing on 2-20-87 at 8:30AM in Ct. Rm #675 CH.

February 14, 1987 Police Activity Sheet, **Exhibit 7.**

    ii. a Form 75-238 stating: "On 2-14-87 at 1:55Pm, defendant William Bailey . . . was

arrested . . . and charged with MURDER and PIC. Bailey was interviewed by

detectives **and gave an exculpatory statement**." (emphasis added).

On 2-14-87 at 1:55PM, defendant William Bailey Jr. B/M30, residence ███████
was arrested on Warrant #152219 inside of Will's Players Den, 5501 Spruce St. by
detectives, and charged with MURDER and PIC.

Bailey was interviewed by detectives and gave an exculpatory statement. Subject
arraigned within six hours in front of B/C Rebstock, ADA Freeman and PD Lieberson
and held WOB for a further hearing on 2-20-87 at 8:30AM, Ct. Rm #675 City Hall.

February 14, 1987 Form 75-328, **Exhibit 8.**

106.    These two contemporaneous documents are the only official police documents

memorializing the February 14, 1987 interview. Neither mention any confession or inculpatory

statement by Mr. Bailey, directly contradicting the fabricated testimony of Defendant Detective

Lubiejewski.

107.    This evidence was not provided to Mr. Bailey's defense counsel in pre-trial

discovery. Nor was it provided during his trial. The Defendants suppressed this information for

over three decades, until it was finally provided to Mr. Bailey's post-conviction counsel by the

DAO on or about 2021.

108.    The Philadelphia Police Department's H-File also contained contemporaneous

police notes that identified the shooter as "Fred."

109.     The note contained within the H-File states "2 shot guys with Fred arguing with

six other guys." The note also provides a motive for the fight and homicide indicating "argument

in bar was over old gang ties."



WB (HF) 000064

H-File Note, **Exhibit 9**.

110. This evidence was not provided to Mr. Bailey in pre-trial discovery. Nor was it provided during his trial. At trial, Mr. Bailey's defense was only aware of Fred R. in the context of being at the scene of the homicide, but counsel did not have the aforementioned note, which detailed a motive for the homicide, description of an alternative suspect, and the alternative suspect's direct involvement in the events that led to the homicide.

111. The Philadelphia Police Department's H-File also contained an Activity Sheet dated February 7, 1987, which included an account of a statement made by the only eyewitness, Mr. Pelzer. The statement was taken within hours of the murder.

112. The account indicates that Mr. Pelzer originally told police that immediately after

20

the shooting "he ran back into the bar with the rest of the crowd. Pelzer thought Brown was dead. Pelzer said that another male that was outside, entered the bar, walked past him to the rear of the bar where there was a group of maybe 6 other people. The male got something from the people and walked back passed him and outside. Pelzer stated that he too went outside."

6. Victor Pelzer, 31 B/M, residence 1417 Rainer Rd. Brookhaven, Pa. was interviewed inside West Detective Division at 12:35AM by Det. Dougherty and Lubiejewski and he stated that at about 10PM, he entered the bar at 5501 Spruce St. He related that the deceased, Derek WALKER, is a friend of his. He stated that Walker was involved in an argument inside of the bar with several people already there. Pelzer stated that the bartenders told them to take the argument outside. Pelzer stated that a large crowd then moved outside. Pelzer stated that WALKER and BROWN then got into a fight. Pelzer stated that WALKER was drunk and that BROWN knocked him down and started beating him, first with his fists then with a beer bottle and then finally with a gun. He said that gun was a revolver. Pelzer stated that BROWN stopped hitting WALKER and as BROWN was getting up off of WALKER a hand came out of the crowd with a gun in it and placed the gun along the head of BROWN and shot BROWN. Pelzer said that he then ran back into the bar with the rest of the crowd. Pelzer thought BROWN was dead. Pelzer said that another male that was outside, entered the bar, walked past him to the rear of the bar where there was a group of maybe 6 other people. The male got something from the people and walked back passed him and outside. Pelzer stated that he too went outside. He was suprised to see that BROWN was gone. Pelzer stated that WALKER was standing there dazed and drunk. Pelzer stated that the male from the back walked past WALKER and up to the corner of 55th and IRVing St. The male was walking back from 55th and Irving St. and as Pelzer was talking to WALKER, the male walked up to WALKER, put a gun, a 25auto to Walker's head and shot him once. The male then gave the gun to another male that walked west on Spruce St. PELZER stated that he has seen the shooter on about 6 different occasions and believes him to be the brother of Al the bartender at that location. PELZER related that initial argument between WALKER and BROWN was over something the WALKER had done in the bar the previous evening. Subject trans to residence at 6:30AM.

February 7, 1987 Police Activity Sheet, **Exhibit 10**.

113.    At trial, Mr. Pelzer changed his story. Pelzer testified that he was in a uniquely favorable position—standing right at the threshold of the bar door—to see the shooter pass by him in close proximity on at least two separate occasions. Peltzer testified that the shooter walked right past him to enter the bar to retrieve the murder weapon and then subsequently walked right by him again as he left to go to the street corner.

114.    Mr. Pelzer's trial testimony was in direct contradiction with his prior statement to police, documented in the suppressed Police Activity Sheet, in which he claimed that he was inside the crowded bar when the shooter walked past him and retrieved the gun, and then walked past him again to exit the bar.

115.    This impeachment evidence was not provided to Mr. Bailey in pre-trial discovery.

Nor was it turned over before or during his trial.

116. Upon information and belief, the H-File also contained audio files compiled by Wayne Stewart, a friend of Mr. Walker, who conducted his own investigation by secretly recording witnesses who were present at the bar on the night of Mr. Walker's murder. The audio tapes reflect a belief among these witnesses that Mr. Walker was "set up" by the bar owner, William Morrison. Some witnesses expressed the belief that Mr. Walker's friend Lenny Braxton did not do enough to protect Walker from the set-up.

117. None of this evidence from the H-File was transmitted to prosecutors. It was therefore not provided to Mr. Bailey's defense counsel in pre-trial discovery. Nor was it provided during his trial.

118. Additionally, the DAO file contained a report of an interview with Will Morrison, who was the owner/manager of the bar.

119. Mr. Morrison was interviewed by Philadelphia Homicide Detectives on the night of the murder, and again two months later. The first statement was not recorded.

120. Mr. Morrison told Philadelphia homicide detectives that neither he nor his bother owned a .25 caliber pistol. However, in his initial statement he told police that if there was a weapon in the bar, it belonged to his brother and that Mr. Morrison's brother "took it out."

121. Additionally, Mr. Morrison told police that he did not see Mr. Bailey the entire night.

122. These statements both corroborate Mr. Bailey's alibi and points to Mr. Morrison and his associates as the true killer and accomplices.

**The Trial**

123. Trial in the matter commenced on August 1, 1988, before the Honorable Albert F.

Sabo, in the Philadelphia Court of Common Pleas. The Notes of Testimony are attached to this complaint as **Exhibits 3-6**.

124. The prosecution hinged on the fabricated confession, and Mr. Pelzer's mistaken identification of Mr. Bailey as the shooter.

125. Victor Pelzer testified that Mr. Bailey was the shooter.

126. Defendant Detective Lubiejewski testified that Mr. Bailey confessed to the murder.

127. Defendant Detective Dougherty testified briefly to arresting Mr. Bailey and filling out a biographical form, listing his height and weight. Mr. Bailey's defense counsel did not cross-examine him.

128. No forensic evidence linking Mr. Bailey to the murder weapon, crime scene, or any other aspect of the crime was presented.

129. Mr. Bailey's defense included alibi witnesses, character witnesses, and witnesses to the shooting who did not see Mr. Bailey at Will's Bar at the time of the shooting and/or who testified someone else was the shooter.

130. Mr. Bailey's brother Albert also testified for the defense but falsely testified that he had never seen a gun in the holster kept behind the bar.

131. Mr. Bailey himself testified in his own defense and denied murdering Mr. Walker or confessing to the crime.

132. The Defense closing emphasized the only two pieces of evidence against Mr. Bailey presented at trial—the fabricated confession and Pelzer's mistaken identification.

133. Mr. Bailey was wrongfully convicted on August 4, 1988, and sentenced to life in prison.

## Post-Conviction proceedings

134. On November 1, 1988, the trial court denied Plaintiff's post-trial motions.

135. In 1990, Plaintiff filed his first Petition for Post-Conviction Relief ACT (PCRA), which was denied without a hearing.

136. In 1994, Plaintiff filed his second PCRA, which included claims of ineffective assistance of counsel and after discovery evidence. A hearing was later held in 1997.

137. During his PCRA hearing testimony on February 5, 1997, Mr. Pelzer recanted his prior identification under oath. Pelzer stated that he was positive that the shooter was <u>not</u> Mr. Bailey.

138. At the hearing, Mr. Pelzer testified that he began to have doubts that Mr. Bailey was the shooter before trial, but the Defendant Detectives assured him that he identified the right person.

139. Mr. Pelzer further testified that his doubts grew even stronger during and after the trial, when he realized that he falsely testified that the shooter had a receding hairline like Plaintiff's.

140. Mr. Pelzer further testified that, after the trial, he had attempted to contact the trial prosecutor to tell her that he had made a mistaken identification. He testified that he had done so before he told an investigator retained by Mr. Bailey's family that he wished to recant his testimony.

141. At the same 1997 hearing, Plaintiff's brother, Albert Bailey also recanted his prior testimony that he was unaware of the existence of the murder weapon stored behind the bar, and admitted that he had, in fact, handed the pistol to the shooter immediately prior to the murder.

142. Albert Bailey testified at the hearing after being colloquied on potential perjury. He testified that there was a .25 Caliber handgun behind that bar that belonged to William Morrison.

143. He further testified that on the night of the shooting, a man he knew as "Fred R." came into the bar and asked for the gun while claiming that Will needed it outside. Albert complied and gave Fred R. the gun.

144. Upon information and belief, "Fred R." is Fred Ransom.

145. Albert Bailey further testified that Fred R. was about the same height and weight as and resembled William Bailey.

146. Albert Bailey explained that he was afraid to come forward earlier not only because he would be implicating himself in Derek Walker's murder but also because he was afraid of retaliation from Fred R. and his associates.

147. Rene Cash also testified at the hearing and indicated that she saw Mr. Bailey leave the bar with Beverly Harris and Eva Mason prior to the shooting. She also testified that her boyfriend at the time, Fred Ransom, arrived at the bar 20 minutes after Mr. Bailey left with Ms. Harris and Ms. Mason. Ms. Cash stayed inside the bar during the fight and did not see Mr. Ransom during that time.

148. James Drewery testified that he observed Fred outside of the bar around 10pm the night of the shooting.

149. The PCRA court denied Plaintiff's petition. For the next twenty-five years, Mr. Bailey would have no legal avenue for challenging his conviction.

150. Mr. Bailey continued to maintain his innocence, supported by family members, attorneys, and advocates including Centurion Ministries and the Pennsylvania Innocence Project.

151. In the years following the 1997 hearing, Mr. Bailey and his supporters continued to gather evidence of his innocence. This included a statement from Leon Rogers, the other bartender at Will's Bar on February 7, 1987, who told William Bailey's PCRA attorney, Robert J. Moss, that

25

he saw Albert Bailey give the murder weapon to someone who was not William Bailey right before Derek Walker was shot.

152. It also included a subsequent statement from eyewitness Kim McCrea, who told an investigator retained by the Baileys that he saw Fred R. running north on 55th Street with a gun in his hand on the night of February 7, 1987.

153. In or about 2019, attorneys representing Mr. Bailey from the Pennsylvania Innocence Project and Blank Rome petitioned the CIU to review Mr. Bailey's case.

154. In 2021, the CIU produced the H-File and DAO files to Mr. Bailey's post-conviction counsel.

155. On April 4, 2024, the Hon. Scott DiClaudio, Judge of the Court of Common Pleas of Philadelphia County granted Mr. Bailey's PCRA petition, vacated his sentence, and ordered a new trial, pursuant to a negotiated sentence deal with the CIU, which resolved the case through a negotiated *Alford* plea to Murder of the Third Degree and Possessing Instruments of a Crime, with a sentence of time served.

156. That same day, Mr. Bailey was released after over 35 years of wrongful incarceration.

**Unconstitutional Misconduct in the Philadelphia Police Department Supporting Plaintiff's Municipal Liability Claim (Count V)**

157. The unconstitutional conduct of the Defendant detectives described above was directly and proximately caused by a long-established history of widespread patterns and practices in the Philadelphia Police Department, in general, and specifically in the Homicide Unit.

158. At all relevant times, the Philadelphia Police Department adopted and maintained policies and/or customs having the effect of official policy that caused the deprivation of William Bailey, Jr.'s constitutional rights.

159. *First*, at all relevant times, the Philadelphia Police Department maintained a widespread custom of suppressing potentially exculpatory evidence against criminal defendants in homicide cases by selectively withholding contents of the Homicide Unit's file, known as the "H-File" (or less commonly, the "M-File") from prosecutors with the Philadelphia District Attorney's Office.

160. Pursuant to this custom, Homicide detectives would selectively determine which documents in the H-File would be included in the "H-Binder" given to the trial prosecutor, rather than providing the entire H-File to the trial prosecutor.

161. Homicide detectives would routinely omit exculpatory evidence from the H-Binder. In doing so, homicide detectives would keep exculpatory evidence out of the prosecutor's possession, thus circumventing the production of exculpatory evidence to defendants that the prosecutor would be required to perform under *Brady v. Maryland*, 373 U.S. 83 (1963).

162. Pursuant to this custom, the Defendants excluded exculpatory evidence from the DAO file and thus suppressed evidence that was material to Mr. Bailey's defense, depriving him of a fair trial.

163. In recent years, numerous post-conviction proceedings, including Mr. Bailey's and others discussed below, have resulted in the DAO turning over both the H-File and DAO file from past convictions. These proceedings revealed numerous discrepancies between the evidence homicide detectives collected in the H-File, and the subset of exclusively inculpatory evidence turned over to prosecutors in the H-Binder.

164. This custom persisted until on or about October 1, 2020, when District Attorney Larry Krasner enacted the Philadelphia District Attorney's Office Policies on: (1) Disclosure of

Exculpatory, Impeachment, or Mitigating Information, (2) Open-File Discovery, by which the DAO requested and turned over the entire police investigation file to criminal defendants' counsel.

### *Unconstitutional Custom of Suppressing Police Activity Sheets*

165. *Second*, at all relevant times, the Philadelphia Police Department maintained a widespread custom of suppressing potentially exculpatory evidence against criminal defendants in homicide cases by uniformly excluding police activity sheets from the H-Binder as a matter of standard practice.

166. Through this custom, the Homicide Unit routinely suppressed exculpatory evidence by keeping it out of the hands of prosecutors, who would have been obligated under *Brady* to turn them over to defendants' counsel.

167. In recent years, numerous post-conviction proceedings, including Mr. Bailey's and others discussed below, have resulted in the DAO turning over both the H-File and DAO file from past convictions, revealing numerous instances of activity sheets containing exculpatory evidence that were not turned over to prosecutors in the H-Binder.

168. Pursuant to this custom, the Defendants excluded police activity sheets containing exculpatory evidence from the DAO file and thus suppressed evidence that was material to Mr. Bailey's defense, depriving him of a fair trial.

169. This custom persisted until on or about October 1, 2020, when District Attorney Larry Krasner enacted Philadelphia District Attorney's Office Policies on: (1) Disclosure of Exculpatory, Impeachment, or Mitigating Information, (2) Open-File Discovery, by which the DAO requested and turned over the entire police investigation file to criminal defendants.

170. *Third*, at all relevant times, the Philadelphia Police Department maintained a widespread and longstanding custom of preparing Affidavits of Probable Cause for Obtaining Arrest Warrants that included only inculpatory evidence and systematically excluded exculpatory evidence. This custom was later codified in the City of Philadelphia's official directives governing the preparation of arrest warrants.

171. On or about August 17, 1994, the Philadelphia Police Department issued Directive 139, which set the official policy regarding Philadelphia police officers' determination of probable cause and the preparation of Affidavits of Probable Cause for Obtaining Arrest Warrants.

172. Upon information and belief, the terms of Directive 139 had been in effect for over 45 years prior to its formal issuance, reflecting a longstanding and entrenched custom within the Philadelphia Police Department.

173. Directive 139 defined "Probable Cause" as "[t]he existence of facts and circumstances that would justify a person of reasonable caution to believe: that an offense has been or is being committed; that the particular person or item to be seized is reasonably connected to the crime; AND that the person can be found at a particular place or the item can be found in the possession of a particular person or at a particular place." Directive 139 further instructed officers to "thoroughly investigate[ ] a complaint or gather[ ] information as to convince a disinterested judge/bail commissioner that probable cause exists to justify issuing an arrest warrant" and to "[e]nter a summary of facts and circumstances sufficient to indicate that a criminal offense(s) was committed AND that they were committed by the defendant named in the warrant."

174. Directive 139's definition of probable cause and its instructions for the preparation of arrest warrant affidavits conflicted with the requirements of the Fourth Amendment. The Fourth

Amendment requires a magistrate to evaluate the "totality of the circumstances," including exculpatory evidence, in determining whether probable cause exists.

175. By instructing officers to present only facts and circumstances "sufficient to indicate" that a crime was committed by the named defendant, and by omitting any instruction to include exculpatory evidence or facts that would negate probable cause, Directive 139 trained and directed Philadelphia police officers to prepare affidavits that presented only inculpatory evidence, systematically excluding evidence favorable to the suspect.

176. In 2013, Directive 139 was renumbered as Directive 5.22, but the same definition of probable cause and the same procedures for preparing arrest warrant affidavits were carried forward without material change. The City of Philadelphia has not amended either Directive 139 or Directive 5.22 to require the inclusion of exculpatory evidence in Affidavits of Probable Cause, nor has it established training programs to address the constitutional deficiency in its officers' preparation of probable cause affidavits.

177. At all relevant times, the Philadelphia Police Department's Homicide Unit operated under a custom that was in line with and codified as Directive 139.

178. As a result of this custom, Philadelphia police officers, including Defendant Detective Lubiejewski, routinely omitted exculpatory evidence from Affidavits of Probable Cause for Obtaining Arrest Warrants.

179. Supervisors who reviewed these affidavits were not trained by the City of Philadelphia to ensure that exculpatory evidence was included, and upon information and belief, supervisors who knew of the existence of exculpatory evidence failed to require officers to include it.

180. The Affidavit of Probable Cause prepared by Defendant Detective Lubiejewski to

arrest Mr. Bailey is a direct product of this unconstitutional custom. As alleged in this Complaint, the Affidavit omitted a witness's identification of an alternative suspect known as "Fred;" omitted Mr. Bailey's verifiable alibi; omitted that six witnesses who knew Mr. Bailey could not place him at the scene; omitted that witnesses who professed to be able to identify the shooter gave descriptions that conflicted with Mr. Pelzer's description; omitted that the photo array was not shown to any other witness besides Pelzer; omitted evidence of witness intoxication; and falsely overstated Pelzer's confidence in his identification. This pattern of material omissions and misrepresentations is consistent with the custom established by Directive 139 and its predecessors.

### *Unconstitutional Custom of Selectively and Deceptively Documenting Witness Interview*

181. *Fourth*, at all relevant times, the Philadelphia Police Department maintained a widespread custom of deceptively and selectively documenting witness and suspect interviews.

182. On or about January 2014, the Philadelphia Police Department instituted a policy of videotaping all interrogations in homicide cases.

183. Prior to the adoption of that policy, it was the widespread custom of the department to not record homicide interrogations by video or audio means.

184. Instead, detectives would selectively record witness statements in handwritten notes, which were then typed and provided to witnesses to sign.

185. By refusing to record the entirety of an interview, as a matter of custom, Philadelphia Police homicide detectives ensured that no complete record of a witness, suspect, or defendant's interview existed to rebut their selective recording of statements taken during interviews.

186. Pursuant to this custom, the Defendants selectively documented their February 14, 1987 interrogation of Mr. Bailey.

### *Unconstitutional Custom of Deceptive and Malicious Investigations*

187.    *Fifth*, at all relevant times, the Philadelphia Police Department had a widespread custom of conducting deceptive and malicious investigations, which led to numerous wrongful convictions, including William Bailey Jr.'s.

188.    This custom was well known to the City and its policymakers as a result of publications, court filings, external and internal investigations, and complaints made by lawyers and civilians of unconstitutional misconduct by Philadelphia Police officers, and particularly homicide detectives.

189.    This custom dates at least as far back as 1977, when a Pulitzer-prize winning *Philadelphia Inquirer* investigative report uncovered a "pattern of beatings, threats of violence, intimidation, coercion and knowing disregard for constitutional rights in the interrogation of homicide suspects and witnesses."

190.    This custom was reflected in the "39th District Scandal," which led to the conviction of five Philadelphia Police Officers on charges of making false arrests, filing false reports, and robbing drug suspects and the overturning of hundreds of convictions.

191.    One FBI official interviewed by *Time* Magazine in the wake of the 39th District Scandal warned, "The history of these kinds of scandals is that cops go right back to acting as they always have when the dust settles, because the pressure they most feel is the pressure to produce results, the constant demand to get the job done." Former Philadelphia Police Officer John Baird, identified as "Blondie" in the same story, who was convicted for his role in the 39th District Scandal, told *Time,* "We didn't invent the system, or the ways to scam it to do the job. We inherited it. We were its custodians. Now others are." *See* Michael Kramer, *How Cops Go Bad,* TIME, Dec. 15, 1997 https://time.com/archive/6731976/how-cops-go-bad/.

192.    Despite efforts made by the City of Philadelphia through the creation of the Internal

Accountability Office ("IAO") in 1996 to deter police misconduct and hold PPD officers accountable for their actions, the same misconduct persisted and continued unabated.

193. A 2003 Report by the IAO found that the Department made "minimal effort" at reforming the outdated disciplinary system meant to deter and punish police misconduct in the years since the inception of the IAO. The report noted that "Since 2000, close to one-half of the officers, supervisors, and commanders who were found by the Internal Affairs Bureau ("IAB") to have violated Departmental policies, or engaged in serious misconduct, were never formally disciplined. In numerous cases where disciplinary actions were taken in response to sustained IAB investigations, the penalties were patently inadequate in light of the severity of the offenses."

194. The 2003 IAO report cited multiple examples of "serious police misconduct" validated by IAB investigations that went unpunished, including officers, supervisors, and commanders who "Engaged in deliberate cover-ups of police misconduct…Falsified police records and reports…Mishandled, and in some cases, stole evidence confiscated during criminal investigations…Violated various departmental policies that involved important integrity issues" and "Conducted grossly inadequate and incomplete investigations."

195. The 2003 IAO report documented dozens of "case studies" of such misconduct, including:

   a. Three undercover officers "caught making an illegal arrest and fabricating the facts to support the improper detention and arrest;"

   b. A Philadelphia police officer who failed a randomly assigned IAB integrity test when he responded to a tip about a nearby narcotics stash by leaving the area without investigating; and

   c. A Detective who routinely "failed to take any investigative actions into serious

crimes" and "routinely falsified his Investigative Reports" to reflect conversations with crime victims that had never taken place.

196. The 2003 report concluded that the PPD was "simply not interested in achieving true reform.

197. In 2004, the Court order mandating the creation of the IAO expired and no further reports were filed.

198. In 2005, the Police Commissioner, Sylvester Johnson, with the backing of then Mayor John Street, publicly attacked the IAO before shutting it down.

199. Rampant police misconduct thus continued in the department through the time of William Bailey's arrest and conviction. This included, but was not limited to, serious misconduct in the form of coercive interrogations, physical assault, perjury, framing of suspects, fabrication of evidence, robbery, and withholding of evidence.

200. Misconduct within the Philadelphia Police Department has led to 96 wrongful convictions since 1980, according to the National Exoneration Registry, including some 49 wrongly convicted Philadelphians exonerated and freed since 2016.

201. These wrongful convictions and subsequent exonerations include:

a. **Eric Joseph** was wrongfully convicted in 1984 of a 1984 robbery-murder in Philadelphia. During post-conviction review, Joseph's attorneys obtained the H-File and discovered nearly a dozen police reports that had never been disclosed to the defense. Those reports revealed that the prosecution's key eyewitness had initially identified a different person as one of the perpetrators, a person who had been incarcerated in another state since 1980, and that another witness had independently identified that same person. The undisclosed records also documented statements from an employee of the business who implicated two of his own relatives and a third individual, described their prior knowledge of the business's cash handling, and stated they had not intended for anyone to be harmed. An anonymous tip received two days after the crime corroborated this account. The

prosecution acknowledged that these eleven items of evidence were suppressed, that they would have allowed the defense to undermine the credibility of the eyewitness identification and pursue an alternative suspect defense, and that the withheld evidence "cast the trial in an entirely different light." Joseph's convictions were vacated in 2026 and the charges dismissed after 42 years of incarceration.

b. **Curtis Crosland** was wrongfully convicted in 1988 of the 1984 murder of a South Philadelphia grocery store owner. When his case was reviewed by the CIU in 2020, it was revealed that homicide detectives withheld exculpatory evidence within the H-File that was never shared with prosecutors or Crosland's defense. This evidence included numerous notes and activity sheets identifying a credible alternative suspect, multiple documents undermining the credibility of the lone individual who initially implicated Crosland, and an activity sheet documenting the failure of a polygraph by the same witness who implicated Crosland. On June 24, 2021, the charges were dismissed and Crosland was released after more than 33 years in prison.

c. **David Turner** was wrongfully convicted in 1988 of a 1987 murder in Philadelphia. The conviction rested entirely on the testimony of a single eyewitness whose account changed materially across multiple statements to police, who admitted to freebasing cocaine at the time of the shooting, and who failed to appear at a preliminary hearing before being arrested and placed on suicide watch. During post-conviction review, the DAO produced the H-File and DAO file, revealing that police and prosecutors had suppressed records documenting the eyewitness's severe psychiatric instability in the days following the crime, including a suicide note and a drawing depicting her own death, information that bore directly on her reliability as a witness and was never disclosed to the defense despite a timely discovery request. During CIU review, the eyewitness recanted entirely, stating she had not seen the shooter and that police had pressured her to identify Turner. The CIU also disclosed that the lead detective had been identified as an officer whose misconduct in other cases contributed to wrongful convictions. The state agreed that the suppressed evidence and the witness recantation warranted a new trial. Turner's conviction was vacated in 2025 and the charges dismissed after 37 years of incarceration.

d. **Ah Lee** was wrongfully convicted in 1988 of the 1983 attempted extortion-turned murder

of a Chinatown restaurant manager. In Lee's post-conviction proceedings, it was revealed that Philadelphia Police had received multiple tips shortly after the murder that three men, not including Lee, had committed the murder. Two of the three were convicted of the murder, and the third was murdered before he could face trial. Lee bore a striking resemblance to one of the three other suspects, Kwa Jai. When showed the photo of the three other suspects, an eyewitness who had previously identified Lee as the shooter confused Lee with Kwa Jai. Philadelphia Police detectives omitted this witness identification of Kwa Jai as the shooter from their records of the eyewitness interview. It was also revealed that Police withheld evidence in the H-File that was exculpatory of Lee and inculpatory of the other three suspects from the prosecution H-Binder, and that the prosecution also withheld exculpatory evidence from Lee's defense. Lee was exonerated and released from prison in 2004.

e. **Andrew Swainson** was wrongfully convicted in 1989 of a 1988 murder in Philadelphia. The conviction rested on eyewitness testimony from a witness who recanted before trial, and then recanted again years later—ultimately stating that police had shown him photographs only of Swainson rather than a proper array, and that a prosecutor had instructed him to identify Swainson and told him to explain his pre-trial recantation by claiming he had been threatened and bribed by the defense. A second witness later recanted as well, stating she had been coerced into testifying falsely. When the H-File was eventually produced during post-conviction review, it contained records never previously disclosed to the defense, including the identities of alternative suspects, evidence suggesting the crime was a robbery rather than a targeted killing, and additional witnesses whose accounts had not been investigated. The files also revealed that the prosecution had concealed pending criminal charges against the key eyewitness under a fictitious name, which were dropped immediately after Swainson's conviction. Swainson's conviction was vacated in 2020 and the charges dismissed after more than 31 years of incarceration.

f. **Anthony Reid** was wrongfully convicted in 1990 of a 1989 murder in Philadelphia. The conviction rested on out-of-court statements attributed to the sole eyewitness, a shooting victim who police claimed was medically unable to sign the statements. The witness recanted at trial and testified that police had threatened him with arrest unless he implicated the defendants and denied making or adopting the unsigned statements. The

prosecution introduced those unsigned statements as evidence over the defense's objection. During post-conviction review, the CIU produced the H-File, which contained medical records that had been suppressed. These records revealed that the eyewitness had been able to sign documents both before and after the periods police claimed his injuries prevented him from signing, and that he had received heavy doses of morphine during the relevant period. The prosecution files also contained an undisclosed pre-trial handwriting analysis that cast doubt on whether the eyewitness had signed all pages of the one statement he was said to have executed. Additionally, forensic evidence used to connect Reid to a separate murder and presented at trial to bolster the eyewitness identification was subsequently found to be unreliable, as reanalysis showed no valid ballistic link between the two crime scenes. Reid's conviction was vacated in 2023 and the charges were dismissed.

g. **Chester Hollman III** was wrongfully convicted in 1993 of the 1991 murder of a UPenn graduate student. Holman was convicted based on testimony from an eyewitness with an extensive criminal record and history of substance abuse and from Jones' neighbor, who had been with him the night of the murder. Both later admitted that their testimony was false and was coerced by Police officers who threatened them with arrest if they did not implicate Hollman. The eyewitness later testified that he was too high on drugs at the time of the murder to recall what he saw, and that the lead detective on the case visited him several times before Hollman's trial and gave him cash, which he used to buy drugs. The CIU took Hollman's case in 2018 and discovered significant exculpatory and impeachment evidence that had been withheld by prosecutors in the prosecution file, as well as evidence withheld by police in the H-File. This evidence included Police records of an anonymous tip that two other individuals had committed the murder. Further investigation by Holman's post-conviction counsel revealed evidence that these individuals had, in fact, committed the murder. Chester Hollman III was released from prison and charges against him were dismissed in 2018.

h. **Theophalis Wilson** was wrongfully convicted in 1993 of three gang-related murders and exonerated in 2020. The conviction rested almost entirely on the testimony of a single cooperating witness who later admitted that his testimony was entirely fabricated—stating that he had implicated Wilson and his co-defendant only after the prosecutor threatened

to withdraw a plea agreement. In 2017, the DAO was ordered to turn over a copy of the H-File, which was found to contain exculpatory evidence never shared with prosecutors or Wilson's defense counsel. When the DAO CIU reviewed Wilson's case, it was revealed that the prosecutors had also withheld thousands of pages of exculpatory evidence from the prosecution file, as well. Among the withheld documents were records of several credible leads on alternative suspects, as well as tips and other evidence exculpatory of Wilson, which homicide detectives never investigated. Wilson was exonerated and released from prison in 2020.

i.  **Christopher Williams** was tried and wrongfully convicted as a co-conspirator of Theophalis Wilson, as well as for other separate murders. He was similarly exonerated after the same misconduct in Wilson's case was uncovered. Williams was also exonerated of the other murders he was convicted of in 1992 and 1993, after testimony implicating him was shown to be false and forensic evidence was retested and Williams was excluded. Williams was released from prison in 220 and the last of his convictions were vacated in 2021.

j.  **Anthony Wright** was wrongfully convicted in 1993 of a 1991 rape and murder and sentenced to life without parole. The conviction rested principally on a confession that Wright maintained was coerced through physical intimidation and violent threats of three Philadelphia homicide detectives, and on bloodstained clothing the detectives claimed to have recovered from Wright's residence. DNA testing conducted in 2013 established that the clothing belonged to the victim rather than to Wright and identified a different individual's DNA profile in the rape kit. At retrial in 2016, two prosecution witnesses recanted their prior testimony, stating it had been coerced by police. Wright was acquitted and released after twenty-five years of incarceration. In 2021, all three detectives were charged with perjury and related offenses; Detectives Santiago and Jastrzembski were subsequently convicted.

k.  **Willie Veasy** was convicted in 1993 of a 1992 murder and sentenced to life without parole. The conviction relied principally on a confession written by a Detective and signed by Veasy following an unrecorded interrogation during which Veasy, who had been arrested in the early morning after a night of drinking, was threatened, slapped, and told he could

leave if he signed the statement. The confession contained multiple factual errors inconsistent with the physical and testimonial evidence, including the color of the vehicle, the type of weapon used, and the number of individuals involved. The prosecution's key eyewitness, who was nearly legally blind, subsequently recanted her identification. Despite a corroborated alibi placing Veasy at his workplace approximately eight miles from the crime scene, the conviction stood for over twenty-six years. In 2019, following an investigation by the CIU—which found unreliable witness identification, substantial disclosure violations, and a pattern of coercive interrogation practices by detectives—the conviction was vacated and charges were dismissed.

l. **Clayton "Mustafa" Thomas Jr.** was wrongfully convicted in 1994 of a 1990 murder in Philadelphia. The case against Thomas rested on the testimony of cooperating witnesses who gave statements to police implicating Thomas. One of those witnesses later recanted, stating that he had testified falsely in exchange for favorable treatment and that he was not present at the scene. During post-conviction review, the H-File, which police had initially represented could not be located, was produced and found to contain evidence that had never been disclosed to the defense. The file included a witness statement indicating that only one car was involved in the crime, directly contradicting the testimony of the cooperating witness who placed Thomas in a second vehicle, as well as records documenting an alternative suspect who had been stopped by police days after the murder in a damaged car matching witness descriptions and who possessed knowledge of the crime not made public. The CIU's review concluded that this suppressed evidence warranted vacating the conviction. The charges against Thomas were dismissed in 2019.

m. **Shaurn Thomas** was wrongfully convicted in 1994 of the 1992 murder of a travel agency owner, after another suspect falsely implicated them as accomplices. Police arrested Thomas despite his having a verifiable alibi. During Thomas's post-conviction proceeding, Thomas's attorneys requested the police H-File, which Philadelphia police claimed they were unable to locate for over two years because it had been removed from the police archive. When the file was produced, it contained investigative records never produced to the DAO or Thomas's defense attorneys, which contained evidence of alternative suspects, as well as evidence that Detectives perjured themselves at Mr. Thomas's trial. The charges against Thomas were dismissed in 2019.

n. **Johnny Berry** was wrongfully convicted in 1995 of a 1994 murder and robbery. The surviving victim initially picked Berry's photo out of a lineup but testified during the preliminary hearing that Berry was not the murderer. The charges were dismissed, then refiled when a suspect linked to the murder by forensic evidence falsely told Police that Berry was his accomplice. The suspect later admitted to lying about Berry's involvement. Berry's convictions were vacated in 2019, after his release from prison at the end of his sentence.

o. **James Kelly** was wrongfully convicted in 1996 of the 1993 murder of a suspected drug dealer. An eyewitness, who admitted to drinking alcohol and smoking crack cocaine the day of the murder, claimed Kelly was one of the shooters after being shown a photo array that included a 15-year-old photo of Kelly. At the preliminary hearing, the eyewitness recanted her identification of Kelly. Kelly also had an alibi, as he was at a family member's house with family and his pastor at the time of the shooting. Kelly was convicted in 1996. In 2018, the CIU reviewed Kelly's case and turned over undisclosed exculpatory evidence about an alternative suspect and evidence of bias and inconsistencies on the part of witnesses against Kelly, which had been withheld in the H-File. Kelly was freed and charges against him were dismissed in June 2024.

p. **Walter Ogrod** was wrongfully convicted in 1996 of the 1988 murder of a child whose naked body was found in a cardboard box. Despite five eyewitnesses telling police they saw a man 5'6" to 5'9" tall, weighing 165 to 175 pounds carrying the box in which the body was found, Police arrested Ogrod, who was 6 feet 1 inch tall and weighed more than 200 pounds. After an 18-hour interrogation, Ogrod signed a confession written by a detective, which he quickly recanted. Later DNA testing and other forensic evidence proved Ogrod did not commit the murder.

q. **Tracy Jordan** was wrongfully convicted in 2006 of a 2004 murder of a check-cashing store owner. The prosecution's case rested on forensic firearms evidence that was subsequently found to be unreliable, and on a single fingerprint connecting Jordan to a bag left at the scene, consistent with his account that he had visited the business days earlier. During post-conviction review, the CIU turned over the H-File, revealing a substantial body of exculpatory evidence that had never been disclosed to the defense. The

suppressed evidence included information that the victim was a federal cooperating witness facing imminent imprisonment, providing an alternative motive for the crime, as well as records identifying a specific alternative suspect who more closely matched the eyewitness description, whom police had never shown to the eyewitness in a photo array. The files also revealed that the firearms examiner testified falsely by characterizing the ballistic evidence as merely inconclusive rather than disclosing that a national ballistic database had returned no match between the crime scene evidence and the weapon attributed to Jordan. Jordan's conviction was vacated in 2024 and the charges dismissed after 18 years of incarceration.

r.  **Edward Stewart**: Edward Stewart was wrongfully convicted in 2007 of the 2006 murder of a customer at a speakeasy he co-owned. Stewart's co-owner, who had prior convictions for drunk driving and drug possession, arrived at the Philadelphia Police station covered in blood and brain matter and told police that he had witnessed Stewart commit the murder. Stewart had an alibi, that he was home with his family at the time of the murder, which was corroborated by his fiancé. Police arrested Stewart, and he was convicted in 2007. At trial, the prosecution presented testimony by the medical examiner about the direction of blood spatter that corroborated the co-owner's story and implicated Stewart. Stewart's fiancé never testified. The Superior Court vacated Stewart's conviction in 2011. Stewart was retried in 2015 and acquitted, based on the alibi testimony of his fiancé, as well as on testimony by a different medical examiner who testified the blood spatter evidence was consistent with the co-owner being the shooter.

s.  **Michael Grant**: Michael Grant was convicted in 2008 of the 2006 shooting and robbery of a man in Southwest Philadelphia. The robbery was witnessed by an off-duty police officer, who pursued the two assailants and apprehended one of them. The victim identified the captured suspect as the robber and described his accomplice as being 5'5," weighing approximately 130 lbs., having a dark complexion, and wearing a puffy jacket. That same night, Michael Grant was a bystander to a shooting at a West Philadelphia Chinese restaurant and sustained a bullet wound to his arm. At the hospital, police questioned Grant and suspected him of being the second robber, despite the fact that Grant did not match the description, as he was 5'10", 300 lbs. with a light complexion and wearing a non-puffy varsity jacket. Police took a photo of him to show the robbery victim,

who identified Grant as the second robber. Grant was convicted of the robbery in 2008. The DAO consented to a new trial in 2023, and at that trial, the first suspect testified that Grant was not involved and that they met for the first time in the holding cell after being arrested. The victim also testified that Grant was not the robber and that he had been coerced into testifying against Grant because failure to do so would have been a parole violation. Grant was acquitted on October 3, 2024.

t. **David Sparks** was wrongfully convicted in 2008 of a 2006 murder in Philadelphia. No physical evidence connected him to the shooting, and the eyewitnesses at trial gave accounts that were internally inconsistent and materially inconsistent with surveillance video from the scene. Both later recanted, stating they did not see Sparks fire a weapon and had been pressured by others in the neighborhood to implicate him. During post-conviction review, the CIU produced the H-Files from the victim's case and from a related murder that had never been disclosed to the defense. Those files included a statement from a witness who told police that a specific other individual had killed the victim in retaliation for a drug dispute, a police notation that the victim's brother killed the same individual in further retaliation, and ballistic evidence linking the weapon used in the victim's shooting to a separate shooting involving that same alternative. A police report from 2008 connecting the ballistic evidence from the two shootings had never been disclosed. Sparks's conviction was vacated in 2023 and the charges dismissed after 17 years of incarceration.

u. **Dontia Patterson** was wrongfully convicted in 2009 of a 2007 murder in Philadelphia. Patterson, who was 17 at the time of the crime, had been a friend of the victim and was observed at the scene in apparent distress. Almost immediately after the shooting, multiple witnesses identified another individual by name as the gunman and provided information about the motive, a dispute over drug territory, but that information was ignored by police and never disclosed to the defense. The police also prepared a report the day after the murder identifying the actual shooter and the groups involved in the underlying drug dispute; that report was similarly suppressed. The H-File contained extensive witness interview notes, including two witnesses who named the shooter and his location, none of which were reduced to formal statements or disclosed. The individual identified as the actual gunman was fatally shot six weeks after Patterson was charged with the murder.

The charges were dismissed in 2018.

#### *Unconstitutional Failure to Train Homicide Detectives*

202.    *Sixth*, at all relevant times, the Philadelphia Police Department had a widespread custom of failing to train its officers in investigative techniques and legal requirements necessary to protect the constitutional rights of suspects, witnesses, and defendants.

203.    In 2021, Defendant Detective Lubiejewski gave an interview for *a Philadelphia Inquirer* article on wrongful convictions involving confessions, **Exhibit 11**, which stated:

> "Lubiejewski, who joined the Homicide Unit in 1978, did not recall any training on how to avoid false confessions, either when he first started out or in the decades that followed.
>
> "There's not much training for a detective," he said. Detective school, as he recalled, was three weeks. "In my case, most of that was spent in typing. Four hours a day in law, and then four hours a day for three weeks learning how to type."

204.    Defendant Detective Lubiejewski's account is corroborated by an independent review of the PPD conducted by the Police Executive Research Forum ("PERF") at the Department's own request.[1]

205.    According to the PERF review, as of 2019 — more than three decades after Mr. Bailey's wrongful conviction — there was still "no training and orientation policy or directive for newly assigned detective" with the Homicide Unit.

206.    As a result, the Philadelphia Police Department failed to train homicide detectives on:

    a.   The proper definition of probable cause;

    b.   The preparation of affidavits of probable cause for obtaining arrest warrants;

    c.   The legal requirement to include all material inculpatory and exculpatory evidence

---

[1] Available at: https://www.documentcloud.org/documents/20696844-perf-findings-recommendations/

in arrest warrants;

d. The conduct and documentation of interviews and interrogations;

e. The proper conduct of photo identifications;

f. The reliability and unreliability of various eyewitness identification techniques

207. The City of Philadelphia fails to train its sergeants, lieutenants and captains, and other supervisors and reviewing and inspecting police officers on:

a. To review Affidavits of Probable Cause for Arrest Warrants for the required inclusion of summaries of all statements and evidence, material to the crime and known to the police, both inculpatory and exculpatory;

b. To supervise the conduct of interviews and interrogations;

c. To correct and report misconduct by officers under their supervision.

### *Unconstitutional Failure to Supervise Homicide Detectives*

208. *Seventh*, at all relevant times, the Philadelphia Police Department had a widespread custom of failing to supervise its homicide detectives to prevent violations of the constitutional rights of suspects, witnesses, and defendants.

209. The PERF review noted that the Homicide Unit operated without formal policies and procedures until December 2017, when it adopted Standard Operating Procedures in the PPD Homicide Unit SOP manual.

210. The PERF review also found that detectives' case documentation was inadequate and that the Department conducted "no significant supervision or formal review of homicide investigations."

211. In the absence of training or standard operating procedures, the Philadelphia Police Department's Homicide Unit's leadership failed to implement supervisory practices necessary to

safeguard the constitutional rights of suspects, witnesses, and defendants.

212. In numerous cases, such as those described above, Philadelphia homicide detectives sought warrants for the arrest of innocent men and women by omitting exculpatory evidence from warrant applications. Any reasonable supervisor presiding over these investigations would have known or had reason to know that permitting detectives to pursue such prosecutions without corrective action by a supervisor to refocus prevent the arrest would result in the unconstitutional arrest and conviction of innocent people.

213. In numerous such cases, Philadelphia homicide detectives arrested innocent men and women, despite evidence in the case file of alternative suspects' guilt. Any reasonable supervisor presiding over these investigations would have known or had reason to know that permitting detectives to pursue such prosecutions without corrective action by a supervisor to refocus an investigation on more probable suspects would result in the unconstitutional arrest and conviction of innocent people.

214. In numerous such cases, Detectives employed illegal and unconstitutional methods to obtain and/or falsify confessions and other forms of evidence. Any reasonable supervisor presiding over these investigations would have known or had reason to know that permitting detectives to pursue such prosecutions without disciplinary action by a supervisor would result in the unconstitutional arrest and conviction of innocent people.

215. In numerous such cases, Detectives purposely omitted exculpatory evidence, including police activity sheets from the H-Binders prepared for DAO prosecutors. Any reasonable supervisor presiding over these investigations would have known or had reason to know that permitting detectives to suppress such evidence would result in the unconstitutional conviction of innocent people.

**DAMAGES**

216. As a direct and proximate result of all of the Defendants' conduct, Plaintiff William Bailey, Jr. was caused to suffer injuries including the following:

   a. Deprivation of liberty in the form of wrongful imprisonment;

   b. Pain and suffering;

   c. Emotional distress;

   d. Mental anguish;

   e. Embarrassment and humiliation

   f. Loss of reputation;

   g. Loss of income and earning capacity;

   h. Loss of consortium;

   i. Loss of life's pleasures;

   j. All damages allowed pursuant to 42 U.S.C. § 1988(a) and any Pennsylvania state law remedies applicable thereby.

217. At the time of his unlawful conviction, Mr. Bailey was a father of three young children, ages nine, three, and two. Due to the Defendants' unconstitutional misconduct, Mr. Bailey missed vital moments in the lives of his children including, but not limited to, graduations, milestones, and the birth and development of his seven grandchildren. While wrongfully incarcerated, Mr. Bailey also missed the death of his father, William Bailey, Sr., the death of his own son, Tariq Bailey, the death of two grandchildren, and other loved ones.

218. As a direct result of Defendants' unconstitutional misconduct, Mr. Bailey suffered economic damages. He has not contributed to any retirement plan since his unlawful arrest.

219. Due to Defendants' unconstitutional misconduct, Mr. Bailey suffered the indignities of inadequate medical and dental care.

220.     Due to Defendants' unconstitutional misconduct, Mr. Bailey was forced to labor for pennies per hour as a prison employee, and to labor uncompensated as his own attorney, working to free himself from a wrongful murder conviction.

221.     Accordingly, Plaintiff Wiliam Bailey, Jr. brings this civil action against Defendants and seeks all appropriate damages and remedies cognizable by law, including punitive damages against the individual Defendants.

## CAUSES OF ACTION

222.     Plaintiff William Bailey, Jr. brings the following claims against Defendants pursuant to 42 U.S.C. § 1983:

## COUNT I: Malicious Prosecution in violation of the Fourth and Fourteenth Amendments
### *Plaintiff William Bailey, Jr. v. Defendants Lubiejewski and John Doe Defendants*

223.      Pursuant to the affidavit of probable cause prepared by Defendant Detective Lubiejewski, the Philadelphia Police Department arrested Mr. Bailey on February 14, 1987.

224.     Upon information and belief, the Affidavit contained numerous material falsehoods and omissions. The Affidavit's material falsehoods and omissions used to obtain a warrant to arrest Mr. Bailey were clearly and obviously at odds with numerous facts known to, and in several instances collected and/or observed by Defendants. Had the affidavit contained complete and truthful statements regarding the investigation into the murder of Derek Walker, the affidavit would have been insufficient to establish probable cause to arrest Mr. Bailey.

225.     Although the Affidavit was reviewed by an Assistant District Attorney, no documents in the post-conviction record, the DAO prosecution file, or anywhere else suggest that the DAO were aware of the multiple false statements or omissions in the Affidavit or of numerous facts exculpatory of Mr. Bailey that were withheld from prosecutors, as documented throughout

this complaint.

226.    In truth and in fact, the only evidence linking Mr. Bailey to the murder was an uncertain, unreliable witness identification by Victor Pelzer. Defendant Lubiejewski was aware of inconsistencies between Mr. Pelzer's uncertain account of the shooting and the statements given by other witnesses with similar or greater credibility. This is insufficient to establish probable cause to arrest William Bailey, Jr.

227.    Defendants, acting in concert with others known and unknown, and within the scope of their employment with defendant City of Philadelphia's Police Department, with malice and knowing that probable cause did not exist to prosecute Mr. Bailey for murder, possession of an instrument of a crime and other related charges, intentionally caused Mr. Bailey to be arrested, charged and prosecuted for those crimes, thereby violating Mr. Bailey's clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free from unreasonable seizures, the issuance warrants without probable cause, and the deprivation of liberty without due process.

228.    Defendants performed the acts described in this Complaint under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Bailey's clearly established constitutional rights. No reasonable police officer would have believed this conduct was lawful.

229.    The prosecution finally terminated in Mr. Bailey's favor on April 4, 2024, when the Hon. Scott DiClaudio, Judge of the Court of Common Pleas of Philadelphia County granted Mr. Bailey's PCRA petition, vacated his sentence, and ordered a new trial.

230.    The acts and omissions by Defendants, as described in this Complaint, were the direct and proximate cause of Mr. Bailey's illegal arrest, malicious prosecution, wrongful

conviction and incarceration and injuries because defendant Detective Lubiejewski knew, or should have known, that his conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Bailey.

**COUNT II: Deliberate Deception in Violation of the Fourteenth Amendment**

*Plaintiff William Bailey, Jr. v. Defendants Lubiejewski, Dougherty, and John Doe Defendants*

231.   The Defendants violated Mr. Bailey's Due Process right to a fair trial by:

a.   Presenting false and/or misleading testimony;

b.   Declining to correct false testimony presented by others;

c.   Fabricating evidence;

d.   Deliberately concealing, suppressing, and/or withholding relevant exculpatory and impeachment evidence as described in this Complaint;

e.   Deceiving the Court in order to frame William Bailey for the murder of Derek Walker.

232.   Defendants' actions were performed under color of state law, intentionally and with reckless disregard for the truth, and with deliberate indifference to Mr. Bailey's constitutional rights. No reasonable officer would have believed this conduct was lawful.

233.   Defendant Detective Lubiejewski deceived the Court by:

a.   Rendering the testimony of Victor Pelzer and Kenneth Murphy false and misleading by suppressing a police activity report containing impeachment evidence, namely inconsistencies in Pelzer's account of where he was standing when he saw the shooter retrieve the gun from the bar.

b.   Rendering the testimony of Detective Dougherty and himself deceptive by virtue of suppressing two police activity reports containing impeachment evidence and/or material for cross-examination, namely that the reports prepared immediately after

49

the February 14, 1987 interrogation stated that Mr. Bailey gave "an exculpatory statement."

c. Rendering the testimony of Mr. Bailey deceptive by suppressing the police activity reports showing that he made an exculpatory statement, not a confession.

d. Presenting false testimony that Mr. Bailey had confessed to the crime.

e. Failing to correct false and misleading testimony created by the Defendant's suppression and fabrication of evidence.

f. Fabricating notes of the February 14, 1987 interview that were admitted into evidence.

234. Defendant Detective Lubiejewski deceived the Court by:

a. Rendering the testimony of Victor Pelzer and Kenneth Murphy false and misleading by suppressing a police activity report containing impeachment evidence, namely inconsistencies in Pelzer's account of where he was standing when he saw the shooter retrieve the gun from the bar.

b. Rendering the testimony of Detective Lubiejewski and himself deceptive by virtue of suppressing two police activity reports containing impeachment evidence and/or material for cross-examination, namely that the reports prepared immediately after the February 14, 1987 interrogation stated that Mr. Bailey gave "an exculpatory statement."

c. Rendering the testimony of Mr. Bailey deceptive by suppressing the police activity reports showing that he made an exculpatory statement, not a confession.

d. Failing to correct false testimony created by Detective Lubiejewski's fabricated confession.

e. Failing to correct false and misleading testimony created by the Defendants' suppression of evidence.

235. Defendants further deprived Mr. Bailey of his right to a fair trial by deliberately failing to pursue or document evidence from witnesses that someone other than William Bailey murdered Derek Walker, in order to deceive the Court by omission and deliberate falsehoods, all of which would have led to Mr. Bailey's prompt exoneration had the misconduct not occurred.

236. Defendants' acts and omissions, as described in this Complaint, were the direct and proximate cause of Mr. Bailey's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Bailey's wrongful arrest, prosecution, and incarceration.

**COUNT III: Withholding Exculpatory Evidence in Violation of the Fourteenth Amendment, pursuant to *Brady v. Maryland***

***Plaintiff William Bailey, Jr. v. Defendants Lubiejewski, Dougherty, and John Doe Defendants***

237. Defendants deprived Mr. Bailey of his clearly established constitutional right to due process of law by withholding evidence exculpatory of Mr. Bailey and that tended to undermine the credibility of witnesses against him, as described above.

238. At all relevant times, by virtue of their tenure as experienced detectives involved in numerous prosecutions, Defendants knew DAO prosecutors were obligated to turn over exculpatory and impeachment evidence to defense counsel pursuant to *Brady v. Maryland.*

239. Defendants purposely withheld exculpatory and impeachment evidence from DAO prosecutors in order to keep it out of the hands of William Bailey's defense counsel and increase the likelihood of the DAO pursuing the prosecution against Mr. Bailey.

240. Defendants purposely withheld this evidence from DAO prosecutors by:

a. Excluding documents in the homicide file that contained exculpatory and impeachment

evidence from the "H-Binder" transmitted to prosecutors, pursuant to a widespread policy and/or custom of the Philadelphia Police Department;

b. Purposely omitting mention of exculpatory and impeachment evidence from documents that would necessarily be included in the H-Binder;

c. Purposely declining to question witnesses about issues that would surface exculpatory or impeachment evidence and/or omitting witness statements containing such evidence from interview reports;

d. Failing to disclose the existence of exculpatory and impeachment evidence through verbal conversations and written correspondence;

e. Other unconstitutional actions to be determined during discovery.

241. Defendants deprived Mr. Bailey of his right to Due Process under color of state law, intentionally and with reckless disregard for the truth, and with deliberate indifference to Mr. Bailey's constitutional rights. No reasonable officer would have believed this conduct was lawful.

242. Defendants' acts and omissions, as described in this Complaint, were the direct and proximate cause of Mr. Bailey's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Bailey's wrongful arrest, prosecution, and incarceration.

## COUNT IV: Fabrication of Evidence in Violation of the Fourteenth Amendment
### *Plaintiff William Bailey, Jr. v. Defendant Lubiejewski*

243. Defendant Detective Lubiejewski violated Mr. Bailey's due process right to a fair trial by fabricating evidence that led to his wrongful conviction.

244. The fabricated evidence included Detective Lubiejewski's perjured oral testimony at trial.

245. The fabricated evidence included Detective Lubiejewski's fabricated handwritten

notes, introduced at trial as exhibit C-27, which the Defendant created to bolster his false testimony.

246. The Defendant deprived Mr. Bailey of his right to Due Process under color of state law, intentionally and with reckless disregard for the truth, and with deliberate indifference to Mr. Bailey's constitutional rights. No reasonable officer would have believed this conduct was lawful.

247. The Defendant's acts and omissions, as described in this Complaint, were the direct and proximate cause of Mr. Bailey's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Bailey's wrongful arrest, prosecution, and incarceration.

### COUNT V: Civil Rights Conspiracy

*Plaintiff William Bailey, Jr. v. Defendants Lubiejewski, Dougherty, and John Doe Defendants*

248. Individual Defendants, acting within the scope of their employment and under the color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Bailey of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, to be informed of the nature and cause of accusations, to have compulsory process for obtaining witnesses in his favor, and to a fair trial.

249. In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including but not limited to, the following:

    a. Arresting William Bailey, Jr. without probable cause;

    b. Fabricating evidence;

    c. Suppressing exculpatory evidence;

    d. Presenting false testimony;

    e. Deliberately deceiving judicial officers.

250. These acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Bailey's injuries. Defendants' actions were committed with deliberate indifference as they knew, or should have known, that their conduct would result in Mr. Bailey's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VI: Municipal Liability

### *Plaintiff William Bailey, Jr. v. City of Philadelphia*

251. The actions of all the Defendants were undertaken pursuant to policies and customs with the effect of policy of the City of Philadelphia, described above, which were ratified by the Police Commissioner, a policymaker with final policymaking authority.

252. These policies and customs included:

a. A widespread custom of selectively withholding the contents of homicide files, also known as "H-Files" or "M-Files," from the case materials turned over to prosecutors ("the H-Binder"), whereby detectives concealed potential exculpatory and impeachment evidence from prosecutors and thereby from Defendants' counsel;

b. A widespread custom of suppressing police activity sheets;

c. A widespread custom of omitting exculpatory evidence from affidavits of probable cause for arrest warrants;

d. A widespread custom of selectively and deceptively documenting interviews and interrogations; and

e. A widespread custom of deceptive and malicious investigations.

253. The widespread custom of conducting deceptive and malicious investigations of suspects was carried out through illegal and unconstitutional methods including, but not limited

to:

a. Fabricating evidence;

b. Tampering with evidence and crime scenes;

c. Withholding exculpatory and/or impeachment evidence;

d. Destroying exculpatory and/or impeachment evidence;

e. Presenting perjured testimony;

f. Deceptively and selectively documenting the investigation and witness interviews;

g. Purposely failing to document witness falsehoods;

h. Employing methodologically unsound ballistics evidence and analysis;

i. Recklessly failing to investigate alternative suspects or leads with the potential to exculpate an initial suspect;

j. Deceptively and/or coercively conducting witness interviews to obtain predetermined testimony and/or obscure case facts from prosecutors, the defense, and the Court;

k. Arresting suspects who did not fit the description provided by eyewitnesses;

l. Arresting suspects who had alibis;

m. Arresting suspects without probable cause;

n. Submitting affidavits of probable cause containing material misstatements and omissions in support of arrest warrants;

o. Framing suspects;

p. Failing to intervene in fellow officers' violation of suspects' constitutional rights;

q. Other unconstitutional actions which may be determined in discovery.

254. The policies and customs described in this count reflected a win-at-all-costs culture

within the Philadelphia Police Department, under which Philadelphia Police officers would routinely violate the constitutional rights of criminal suspects and defendants, including William Bailey, Jr. in order to obtain a conviction, regardless of actual innocence.

255. The policies, customs, and practices described in this Count were maintained and implemented by the City of Philadelphia with deliberate indifference to Plaintiff's constitutional rights, under the Fourth and Fourteenth Amendments as they could clearly and obviously lead to the arrest, conviction, imprisonment, and/or execution of innocent people.

256. As a direct and proximate result of the City of Philadelphia's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**COUNT VII: Municipal Liability – Failure to Supervise**

*Plaintiff William Bailey, Jr. v. City of Philadelphia*

257. The actions of all the Defendants were undertaken pursuant to policies and customs with the effect of policy of the City of Philadelphia, described above, which were ratified by the Police Commissioner, a policymaker with final policymaking authority.

258. Pursuant to a widespread custom of constitutionally inadequate supervision of homicide detectives, Defendant City of Philadelphia caused the violation of Mr. Bailey's constitutional rights through his wrongful arrest and conviction by the Philadelphia Police Department.

259. The policies, customs, and practices described in this Count were maintained and implemented by the City of Philadelphia with deliberate indifference to Plaintiff's constitutional rights, under the Fourth and Fourteenth Amendments as they could clearly and obviously lead to the arrest, conviction, imprisonment, and/or execution of innocent people.

260.     As a direct and proximate result of the City of Philadelphia's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

## COUNT VIII: Municipal Liability – Failure to Train
### *Plaintiff William Bailey, Jr. v. City of Philadelphia*

261.     The actions of all the Defendants were undertaken pursuant to policies and customs with the effect of policy of the City of Philadelphia, described above, which were ratified by the Police Commissioner, a policymaker with final policymaking authority.

262.     Pursuant to a widespread custom of constitutionally inadequate training of homicide detectives and supervisors, Defendant City of Philadelphia caused the violation of Mr. Bailey's constitutional rights through his wrongful arrest and conviction by the Philadelphia Police Department.

263.     The policies, customs, and practices described in this Count were maintained and implemented by the City of Philadelphia with deliberate indifference to Plaintiff's constitutional rights, under the Fourth and Fourteenth Amendments as they could clearly and obviously lead to the arrest, conviction, imprisonment, and/or execution of innocent people.

264.     As a direct and proximate result of the City of Philadelphia's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

**WHEREFORE**, Plaintiff William Bailey, Jr. respectfully requests that this Honorable Court enter Judgment in his favor and against Defendants, jointly and severally, in an amount in excess of any arbitration limit in the District Court for the Eastern District of Pennsylvania, including interest, plus Plaintiff's costs and attorney's fees, and punitive damages against all

individual Defendants, as well as any other relief this Court deems just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all counts and all issues raised by this Complaint.

Respectfully Submitted,

**KLINE & SPECTER, PC**

Date: April 1, 2026     BY: /s/ Thomas R. Kline
Thomas R. Kline (No. 28895)
Tom.Kline@klinespecter.com
Aaron L. Dunbar (No. 317773)
Aaron.Dunbar@klinespecter.com
Wyatt J. Larkin (No. 334482)
Wyatt.Larkin@klinespecter.com
1525 Locust Street
Philadelphia, PA 19102
Telephone: 215.772.1000
thomas.kline@klinespecter.com
aaron.dunbar@klinespecter.com
wyatt.larkin@klinespecter.com
*Attorneys for Plaintiff*